UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Charles M. Murrell, III, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 1:23-cv-11802-IT |
| Patriot Front, Thomas Rousseau, and John Does 1-99, | * | |
| | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER

January 13, 2025

TALWANI, D.J.

On the Fourth of July weekend in 2022, Defendants Thomas Rousseau and Patriot Front conducted an unpermitted "flash march" through Boston, Massachusetts, to promote a white supremacist agenda. Seizing control of Boston's public sidewalks while wearing face coverings and carrying shields, Patriot Front members shoved Plaintiff Charles Murrell, a Black musician who was walking on the sidewalk, up against a light post and into a busy street.

In this action, Murrell seeks to vindicate his rights under federal and state laws and hold Defendants responsible for their actions. For the following reasons, Plaintiff's Motion for Default Judgment [Doc. No. 46] is GRANTED. Plaintiff is awarded $755,000 in damages for his physical and psychological injuries, pain and suffering, lost wages, and future earnings, $2,000,000 in punitive damages, and reasonable attorneys' fees and costs in an amount to be determined.

## I.    Procedural History

On August 8, 2023, Plaintiff filed a <u>Complaint</u> against Patriot Front, Rousseau, and John Does 1-99. <u>See</u> Compl. [Doc. No. 1].[1] The first two Counts are against all Defendants. In Count One, Plaintiff alleges a conspiracy in violation of 42 U.S.C. § 1985(3). <u>Id.</u> ¶ 121. In Count Two, he alleges violations of the Massachusetts Civil Rights Act, M.G.L. c. 12 § 11I. <u>Id.</u> ¶ 130. The remaining state law Counts are against Rousseau and the John Doe Defendants. Plaintiff alleges in Count Three a conspiracy and in Count Four aiding and abetting of civil rights violations and tortious conduct, including assault and battery and intentional infliction of emotional distress. <u>Id.</u> ¶¶ 134, 139. In Count Five, he alleges assault and battery. <u>Id.</u> ¶ 142. Finally, in Count Six, he alleges intentional infliction of emotional distress. <u>Id.</u> ¶ 146. Plaintiff's <u>Complaint</u> sought compensatory, statutory, and punitive damages in an amount to be determined at trial, as well as reasonable attorneys' fees and interest. <u>Id.</u> at 44; <u>see</u> also <u>id.</u> ¶¶ 128-29, 133, 137, 141, 145, 149.

On the day that Plaintiff filed his <u>Complaint</u>, Patriot Front posted a video of its activity in Boston in a Telegram post. See Decl. of James M. Gross ¶ 16 [Doc. No. 17]. Between that date and November 1, 2023, Plaintiff made five attempts to serve Rousseau and multiple attempts to serve a different known leader of Patriot Front. <u>See id.</u> ¶¶ 4, 6, 8-9; Exs. A, B, C, D [Doc. Nos. 17-1; 17-2; 17-3; 17-4]. On November 7, 2023, this court allowed Plaintiff to serve Patriot Front by email or by Patriot Front's social media accounts, as Patriot Front had referenced the lawsuit on its social media platforms. <u>See</u> Mem. & Order on Mot. for Service by Alternative Means at 3 [Doc. No. 20]. Plaintiff successfully served Patriot Front via email on November 10, 2023, and

---

[1] Plaintiff has not served the John Doe Defendants and states that, "[t]o the extent necessary, [he] will file a voluntary stipulation of dismissal without prejudice of his claims against the John Doe Defendants pursuant to Rule 41(a)(1)(A)(i)." <u>See</u> Mem. in Supp. of Mot. for Default Judgment at 9 n.1 [Doc. No. 47]. Such a filing would allow the court to enter final judgment in this matter.

via the website Telegram on November 13, <u>see</u> Aff. of Service of Patriot Front [Doc. No. 21],

and, on February 28, 2024, served Rousseau at the McLennan County Jail in Waco, Texas, <u>see</u>

Proof of Service of Thomas Rousseau at 2 [Doc. No. 29].

## II.    The Pending Motion for Default Judgment

Rule 55 of the Federal Rules of Civil Procedure establishes a two-step process for entry

of a default judgment. The first step is a clerk's entry of a default under Rule 55(a), which

provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed

to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must

enter the party's default." The second step requires entry of a default judgment by the clerk if the

plaintiff's claim is for a sum certain, or otherwise by the court, on an application for a default

judgment. <u>See</u> Fed. R. Civ. P. 55(b).

After Patriot Front and Rousseau failed to respond to the summons and complaint, the

clerk entered default pursuant to Fed. Rule of Civ. Proc. 55(a) as to Patriot Front, on December

19, 2023, <u>see</u> Notice of Default as to Patriot Front [Doc. No. 23], and as to Rousseau, on April

23, 2024, <u>see</u> Notice of Default as to Thomas Rousseau [Doc. No. 33]. Plaintiff subsequently

filed the instant <u>Motion for Default Judgment</u> pursuant to Fed. Rule of Civ. Proc. 55(b).[2] The

motion seeks: (1) a default judgment for Plaintiff on each claim asserted against Defendants

---

[2] Service of the motion on the defaulted Defendants was not required for entry of judgment. <u>See</u> <u>Ortiz-Gonzalez v. Fonovisa</u>, 277 F.3d 59, 63 (1st Cir. 2002) ("judgment can be entered against a defendant without notice where the party has failed to appear"); FRCP 55(b)(2) ("If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 7 days before the hearing."). Nonetheless, Plaintiff served Patriot Front c/o Thomas Rousseau by email, with the motion for default judgment and supporting papers as well as the court's order setting an evidentiary hearing on the motion. <u>See</u> Aff. of Alternate Service [Doc. No. 42]; Aff. of Alternate Service [Doc. No. 49].

Patriot Front and Rousseau in the Complaint [Doc. No. 1]; (2) general and special damages, for

which Defendants Patriot Front and Rousseau are to be jointly and severally liable; (3) punitive

damages against Defendants Patriot Front and Rousseau; and (4) permission to file a motion for

attorneys' fees within 30 days of the entry of this court's ruling on the motion. See Mot. for

Default Judgment at 1-2 [Doc. No. 46].

The court held an evidentiary hearing on October 2 and 3, 2024, to determine damages.

Defendants did not appear for the hearing.

### III.    Liability

A.    *Legal Standard on Default*

When a defendant has failed to respond to the complaint, the court presumes that all well-

pleaded factual allegations relating to liability are true. See Sec. & Exch. Comm'n v.

Tropikgadget FZE, 146 F. Supp. 3d 270, 275 (D. Mass. 2015). So, when determining liability, a

defendant's default functions as an admission of the plaintiff's well-pleaded allegations of fact.

Id.

The court may also hold a hearing to "establish the truth of any allegation by evidence."

See Fed. R. Civ. P. 55(b)(2)(C); Quirindogo Pacheco v. Rolon Morales, 953 F.2d 15, 16 (1st Cir.

1992).

B.    *Findings of Fact[3]*

1.    Charles Murrell[4]

Charles Murrell is an African American musician, composer, and civil rights activist. He considers himself an "artivist," using art to create social change.

Murrell grew up in Delaware hearing stories about white supremacists who tried to shoot and hunt his great-grandfather.

Murrell began taking college-level music classes while still in high school. Eventually, he matriculated to study music at several universities, including at historically black colleges and universities and at the New England Conservatory in Boston, where he studied classical saxophone, with a focus on the music of Johann Sebastian Bach.

Murrell is now in his thirties and had been residing in Massachusetts for eight to ten years at the time of the attack. After leaving the New England Conservatory, Murrell focused on developing a career in street performance; he continued to play the music of Bach on his saxophone (and occasionally on his flute), hoping to reach a non-elite audience that included more people of color, including children. He especially liked to play in front of the Boston Public Library, where he was heading on the day of the attack, because he could project sound off the building due to its amphitheater-like shape.

In addition to his street performances, Murrell played music with multiple West African dance companies, including beheard.world and Trend Stream. Through these performances,

---

[3] In addition to well-pleaded factual allegations as to liability included in Plaintiff's <u>Complaint</u>, other facts in this Section are drawn from the testimony and exhibits submitted at the October 2 and 3, 2024 evidentiary hearing and a supplemental submission filed with leave of court after the hearing. Further detail as to materials considered is provided in each subsection.

[4] Facts in this subsection are drawn from Plaintiff's <u>Complaint</u>, and the testimony of Murrell and a friend, Oliver Burns.

Murrell furthered his mission of playing the music of artists like Bach in non-classical, non-elitist venues.

Murrell has also taught music in a variety of settings. Between 2014 and 2016, Murrell worked at the Home for Little Wanderers, an agency that helps young people cope with significant life changes through residential and clinical programs as well as through education. At the Home for Little Wanderers, Murrell worked with children of all ages, including teenagers, many of whom were on individualized education programs. He helped establish the organization's first music center and music suite.

By 2021, Murrell was working on several projects with an organization called Spoke, including an art exhibit, a panel focusing on people's connection with HIV and AIDS, and a 24-hour vigil. He worked as a teaching artist for Spoke's summer program in 2021. The organization also recruited Murrell for an artist's residency in Italy that was to take place the month following the attack. Outside of playing and teaching music, Murrell also worked with a colleague and friend, Oliver Burns, to try to publish Burns's book.

      2.      Patriot Front and Thomas Rousseau[5]

Patriot Front is a white supremacist group. According to expert testimony, organizations within the white supremacist movement share the goal of creating a white ethnostate, in which

---

[5] Facts in this subsection are drawn from: (1) the testimony of Dr. Peter Simi, Ph.D., a Professor of Sociology at Chapman University, whom the court found qualified as an expert on the white supremacist movement, characteristics of white supremacist organizations, and whether Patriot Front shares those characteristics; (2) Plaintiff's Complaint; (3) a manifesto published by Patriot Front on its website, see Patriot Front Manifesto [Doc. No. 58-1]; and (4) video evidence of Patriot Front's training, see Pl.'s Ex. L, Patriot Front Drilling Instruction Video Number One [Doc. No. 48-12] (showing Patriot Front members learning to march and assemble in formation and to attack in unison using shields); Pl.'s Ex. M, Patriot Front Drilling Instruction Video Number Two [Doc. No. 48-13] (showing Patriot Front members wearing matching uniforms and face coverings, with some members carrying upside-down American flags, while others practice

whites would either dominate and rule over non-whites or in which non-whites could not live. White supremacist groups perceive those outside the group as an existential threat to the white race and express an admiration for Adolf Hitler and Nazi Germany. It is typical for these groups to try to provoke others into potentially aggressive behavior and to promote and glorify violence by their members. As Plaintiff's expert testified, Patriot Front embodies the characteristics of such organizations.

Patriot Front evolved out of another group, Vanguard America, which was also was led by Rousseau. Vanguard America participated in the Unite the Right Rally, a white nationalist rally in Charlottesville, Virginia, in August 2017. At that rally, an individual named James Fields was photographed with Rousseau wearing matching white polo shirts; in the photo, Fields held a shield with Vanguard America's logo. Fields subsequently plowed his car into a group of counter-protesters, killing a woman named Heather Heyer and injuring 19 others.

Eighteen days after the Unite the Right Rally, Vanguard America rebranded as Patriot Front. A central goal of Patriot Front, and of Vanguard America before it, is to create an exclusively white United States of America. Patriot Front's manifesto, published on its website, states:

> Those of foreign birth may occupy civil status within the lands occupied by the state, and they may even be dutiful citizens, yet they may not be American. Membership within the American nation is inherited through blood, not ink. Even those born in America may yet be foreign. Nationhood cannot be bestowed upon those who are not of the founding stock of our people, and those who do not share the common spirit that permeates our greater civilization, and the European diaspora.

---

shoving and corralling people using shields); Pl.'s Ex. N, Patriot Front Drilling Instruction Video Number Three [Doc. No. 48-14] (showing members in matching uniforms and face coverings, practicing group tactics involving shoving and subduing individuals using shields).

See Patriot Front Manifesto at 2 [Doc. No. 58-1]. The manifesto further portrays non-white

individuals as an existential threat to the country, stating that "[t]he nation will see the thin

veneer of civilization begin to wane as the current plutocracy diverts the toils of Americans to

extranational masses. The same population that has been imported to supersede the nation will

then be enslaved upon our ashes." Id. The manifesto also suggests a need for violence to carry

out the group's goals, including a quote attributed to Charles Lindbergh: "We can have peace

and security only so long as we band together to preserve that most priceless possession, our

inheritance of European blood, only so long as we guard ourselves against attack by foreign

armies and dilution by foreign races." Id.

Patriot Front has taken a variety of steps, under the direction and with the approval of

Rousseau, to promote its white supremacist agenda, including defacing a mural of George Floyd

in Philadelphia, statues of Floyd in Brooklyn and Newark, and a mural of the black tennis player,

Arthur Ashe, in Virginia. Patriot Front posted videos of its activities online.

Patriot Front, under Rousseau's leadership, has trained its members to be violent. It

taught its members how to march in lockstep formation, using shields as weapons to clear their

way of anyone in their path. At the evidentiary hearing, Plaintiff presented video evidence of this

and other training.

Patriot Front organizes what it calls "flash demonstrations," in which members descend

unannounced on different cities and take over public streets and sidewalks, without obtaining

permits. During such demonstrations, members march in formation, wear matching khaki pants

and polo shirts, and carry American flags. They also wear face coverings, chant "Blood and Soil"

(a slogan with origins in Nazi Germany) and carry shields and flags with Patriot Front's logo and

other white supremacist imagery. The demonstrations often also include speeches by Rousseau

8

promoting white supremacist beliefs. Patriot Front leaders, including Rousseau, warn members that failing to participate in the organization's activities can result in removal from the group.

Patriot Front members use racist slurs in their communications and promote Nazi Germany's "final solution" in reference to Jewish people. In internal communications, Patriot Front members discuss developing what they call "ethnorape gangs" to target unmarried white women, while their external communications attempt to project an image of patriotism. The group also promotes and glorifies violence, such as by posting videos online of physical attacks on black people.

    3.    Patriot Front's Boston "Flash" March and Attack of Charles Murrell[6]

Patriot Front began planning the Fourth of July weekend flash demonstration in Boston as early as December 2021. The group sought no permits, and the city had no advance notice. See Phillip Martin, *Wu, Rollins Say They Had No Warning of White Supremacist Group's Plans to March in Boston*, WGBH, July 5, 2022 [Doc. No. 58-3].

On July 2, 2022, members of Patriot Front, including Rousseau, assembled for the flash march. Crowding others off the public sidewalks, Patriot Front members carried shields, flags,

---

[6] Facts in this subsection are drawn from: (1) Plaintiff's Complaint; (2) the testimony of Charles Murrell; (3) the testimony of Katrina Jabro, a witness to the attack; (4) the testimony of Dr. Peter Simi; (5) camera footage showing the attack, see Pl.'s Ex. H, Traffic Camera Footage 1:20:30 PM [Doc. No. 48-8]; Pl.'s Ex. I, Starbucks Video Footage 1:21:00 PM [Doc. No. 48-9]; Pl.'s Ex. J, Officer Body Camera Footage [Doc. No. 48-10]; (6) a police report written by an officer who observed and followed Patriot Front members from a distance, see Officer Steven Chen's Police Report [Doc. No. 58-2]; (7) a report from a Detective with the Boston Police Department Civil Rights Unit written a few days after the attack, see Detective Lakenya Webster July 9, 2022 Report [Doc. No. 48-6]; (8) a promotional video for Patriot Front, published on the group's website, showing the attack, see Pl.'s Ex. O, Patriot Front Promotional Video Minute 16:10 [Doc. No. 48-15]; and (9) images of Murrell published in news outlets after the attack, see Boston Herald Image of the Attack [Doc. No. 48-2]; Boston Globe Image of the Attack [Doc. No. 48-3].

and signs that read "RECLAIM AMERICA." Members (other than Rousseau) also wore face coverings that hid their identities. The group stopped briefly at the Boston Public Library, where their leader, Rousseau, gave a speech about his view that liberty and safety are incompatible. After leaving the Boston Public Library, approximately 100 Patriot Front members marched towards the Freedom Trail, vastly outnumbering the handful of Boston police officers present on foot or bike. At the intersection of Stuart and Dartmouth Streets, Patriot Front encountered Charles Murrell.

Murrell was on his way to play saxophone near the Boston Public Library and heard the marchers' snare drum as he walked in the direction of the sound. Murrell saw Patriot Front moving towards him on the sidewalk, and observed signs that read, "Reclaim America," as well as colony flags. Murrell reached for his phone to record the scene but was too nervous to successfully unlock his phone to start a recording.

Murrell heard one of the attackers in the group called him "tar baby." Dr. Simi testified that the use of this racial slur is an example of the triggering provocation characteristic of white supremacist groups. Murrell tried to walk forward on the sidewalk. But Patriot Front members blocked the wide public sidewalk from end to end. The group circled Murrell and pushed him back over two car lengths as members yelled, "DO NOT BREAK OUR RANKS." Rousseau then yelled "RIGHT SCREEN," and the group began shoving Murrell to the group's right, into the street. When Murrell stepped back on the sidewalk, the group pressed him up against a concrete light post, knocked him to the ground, and hit and kicked him. Finally, Murrell heard somebody say, "that's enough," and as law enforcement arrived, the attackers moved on.

Based on officer body video camera footage, a police officer who arrived at the scene asked Murrell if he needed emergency medical services. Murrell stated that he did. He further

told the officer: "You're not doing anything to apprehend the people that just assaulted me. If I would have assaulted somebody, I would be arrested right now." <u>See</u> Pl.'s Ex. J, Officer Body Camera Footage 05:23:14 PM [Doc. No. 48-10]. The officer told Murrell that the police were "watching the group," and another officer at the scene said that they wanted to write a report so that they could conduct an investigation. The officers reiterated that the police were aware of the group's movements, and they took down information from a witness at the scene. The police did not apprehend anyone at the scene but did call an ambulance.

After Murrell was taken to the hospital, Boston Police officers trailed the Patriot Front members from a distance and watched them load flags and shields into the back of a U-Haul truck and then enter Back Bay station. The officers followed the U-Haul truck and wrote down the vehicle's license plate number. Officers later tracked the rental truck to Stoneham, Massachusetts, where officers discovered that the license plate attached to the truck was unregistered.

In the following days, a Detective with the Boston Police Department Civil Rights Unit investigated Patriot Front's attack of Murrell and concluded, based on a police report and conversations with Murrell and a witness, that the "incident appeared to be more likely than not motivated in whole or in part by Anti-Black bias." Detective Lakenya Webster July 9, 2022 Report at 3 [Doc. No. 48-6]. No one, however, was prosecuted.

Patriot Front later published footage of the attack on its website.

C.    *Conclusions of Law*

    1.    Count One

The first clause of 42 U.S.C. § 1985(3) provides a cause of action for a private conspiracy to deny the equal protection of the laws. To prevail on a Section 1985(3) claim on a default judgment, plaintiffs must allege facts to support four elements:

> First, the plaintiff must allege a conspiracy; second, he must allege a conspiratorial purpose to deprive the plaintiff of the equal protection of the laws; third, he must identify an overt act in furtherance of the conspiracy; and finally, he must show either injury to person or property, or a deprivation of a constitutionally protected right.

See Parker v. Landry, 935 F.3d 9, 17-18 (1st Cir. 2019) (modifications omitted) (quoting Perez-Sanchez v. Pub. Bldg. Auth., 531 F.3d 104, 107 (1st Cir. 2008)). "An actionable section 1985(3) claim must allege that (i) the alleged conspirators possessed 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus,' and . . . (ii) their alleged conspiracy was 'aimed at interfering with rights . . . protected against private, as well as official, encroachment.'" Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23, 32 (1st Cir. 1996) (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971); United Bhd. of Carpenters & Joiners of America v. Scott, 463 U.S. 825, 833 (1983)).

Plaintiff has alleged the four elements of a Section 1985(3) claim. As to the first and second elements, Plaintiff has alleged a conspiracy whose purpose was to deprive Plaintiff, and people like Plaintiff, of the equal protection of the laws because of their race—specifically his rights to "be free of the badges and incidents of slavery pursuant to the Thirteenth Amendment, as well as Mr. Murrell's rights to travel protected by the Fourteenth Amendment." See Compl. ¶¶ 122, 127. Patriot Front had between 200 and 300 members as of the end of 2021. Id. ¶ 39. These members worked together to promote the view that only descendants of white European

immigrants are "true" Americans, id. ¶¶ 42-43, that African Americans are not American, id. ¶ 44, and that the rise in "extranational masses" will cause "the thin veneer of civilization [to] begin to wane," id. ¶ 45. See also Patriot Front Manifesto at 2 [Doc. No. 58-1]. To promote this agenda, Patriot Front members participated in flash demonstrations like the one in Boston, Compl. ¶ 54, where they wore matching clothes and face coverings, id. ¶ 66, and used violent tactics learned through drills, id. ¶¶ 73-76.

The Boston flash march was planned months in advance, id. ¶ 96, and before the march, Rousseau instructed Patriot Front members to engage in physical training, including with shields like those used in the attack of Murrell, id. ¶ 97. During the attack, Patriot Front members acted in consort to pin Plaintiff against a light post and force him off the sidewalk. One member of the group called Plaintiff a racial slur immediately before the attack, while other members carried banners displaying racist messages during the attack. See supra Section III.B.3. These actions amount to a conspiracy to deprive Plaintiff of his equal rights due to his race. See Perez-Sanchez v. Pub. Bldg. Auth., 531 F.3d 104, 108 (1st Cir. 2008) ("1985(3) was intended to address racial animus first and foremost").

As to the third element, Plaintiff has shown that Defendants engaged in an overt act in furtherance of the conspiracy when they blocked Murrell from traveling on a public sidewalk and attacked him. See supra Section III.B.3. Finally, Plaintiff suffered an injury to his person. Therefore, Plaintiff has stated a claim for a violation of Section 1985(3) and is entitled to a default judgment on Count One.

### 2.    Count Two

In Count Two, Plaintiff alleges violations by Defendants of the Massachusetts Civil Rights Act (MCRA), M.G.L. c. 12 § 11I. Compl. ¶ 130. The MCRA creates remedies for "[a]ny

person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with [by any person, whether or not acting under color of law, by threats, intimidation or coercion]." Currier v. National Bd. of Medical Examiners, 462 Mass. 1, 11-12 (2012) (quoting M.G.L. c. 12 § 11I). M.G.L. c. 12 § 11I is largely coextensive with 42 U.S.C. § 1983, "except that the Federal statute requires State action whereas its State counterpart does not." Batchelder v. Allied Stores Corp., 393 Mass. 819, 822-23 (1985). "To prevail, a plaintiff must prove that (1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion," where coercion is understood as "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.'" Currier, 462 Mass. at 12 (citing Buster v. George W. Moore, Inc., 438 Mass. 635, 644-46 (2003)). Plaintiff has alleged all three elements, where Plaintiff has alleged facts to show that Defendants violated his right to be free from racial harassment and violence and his right to travel along public thoroughfares through their physical attack of Plaintiff. Compl. ¶ 132. He is entitled to a default judgment on Count Two.

        3.     Count Three

     Plaintiff's Third Count alleges that Rousseau is liable under state law for engaging in a civil conspiracy. See Compl. ¶¶ 134-138; Mem. in Supp. of Mot. for Default Judgment at 7 [Doc. No. 47]. Massachusetts law recognizes such a tort, which essentially encompasses situations in which two or more persons act in concert to do harm to another. See Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1564 (1st Cir. 1994). Plaintiff has alleged Rousseau's participation in and overt acts in furtherance of a conspiracy whose purpose was to deprive

Plaintiff and other non-white people of the equal protection of the laws because of their race. See supra Section III.C.1. Therefore, Plaintiff has stated a claim for civil conspiracy and is entitled to a default judgment on Count Three.

       4.    Count Four

Plaintiff's Fourth Count alleges that Rousseau is liable for aiding and abetting tortious and unlawful conduct. See Compl. ¶ 139-141; Mem. in Supp. of Mot. for Default Judgment at 7 [Doc. No. 47]. To state a claim for aiding and abetting against a defendant, a plaintiff must allege: (1) that a person committed a tort; (2) that the defendant knew the person was committing the tort; and (3) that the defendant "actively participated in or substantially assisted in his commission of the tort." See Go-Best Assets Ltd. v. Citizens Bank of Massachusetts, 463 Mass. 50, 438 (2012) (citing Arcidi v. National Ass'n of Gov't Employees, 447 Mass. 616, 623–24 (2006); Restatement (Second) of Torts § 876(b) (1977)).

Here, Plaintiff has stated a claim against Rousseau for aiding and abetting unlawful and tortious conduct where Plaintiff has alleged facts showing that members of Patriot Front committed torts—battery at a minimum—against Plaintiff and facts showing that Rousseau, as the leader of Patriot Front, aided and assisted in those torts. See Compl. ¶ 11 ("Rousseau organized, planned, and led Patriot Front's march through Boston on July 2, 2022, and he was part of the mob of Patriot Front members who attacked Mr. Murrell."); id. ¶ 111 ("As the mob surrounded Mr. Murrell, Defendant Thomas Rousseau yelled, 'RIGHT SCREEN!'"). Plaintiff is entitled to a default judgment on Count Four.

       5.    Count Five

Plaintiff's Fifth Count alleges that Rousseau is liable for civil assault and battery. See Compl. ¶¶ 142-145; Mem. in Supp. of Mot. for Default Judgment at 7 [Doc. No. 47]. An assault

is "an act which puts another in reasonable apprehension of imminent harmful or offensive contact, that is, an attempted battery or an immediately threatened battery." Conley v. Romeri, 60 Mass. App. Ct. 799, 806 n.6 (2004) (citing Restatement (Second) of Torts § 21 (1965)). A battery is an intentional harmful or offensive contact with another. See Waters v. Blackshear, 412 Mass. 589, 590 (1992) (citing Restatement (Second) of Torts § 13 (1965)).

Plaintiff has stated a claim against Rousseau for battery.[7] Rousseau led a group of Patriot Front members who carried shields as weapons, surrounded Plaintiff on the sidewalk, beat Plaintiff with their shields, fists, and feet, and forced Plaintiff against a pole. Compl. ¶ 4; Boston Herald Image of the Attack [Doc. No. 48-2]. Rousseau yelled a command—"RIGHT SCREEN!"—that precipitated attack, demonstrating his intent to cause a harmful contact with Plaintiff. Compl. ¶ 111. Plaintiff is entitled to a default judgment on Count Five.

6.    Count Six

Plaintiff's Sixth Count alleges that Rousseau is liable for intentional infliction of emotional distress ("IIED"). See id. ¶¶ 146-150; Mem. in Supp. of Mot. for Default Judgment at 7 [Doc. No. 47]. To state a claim for IIED, a plaintiff must show: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct . . . ; (2) that the conduct was "extreme and outrageous," was "beyond all possible bounds of decency," and was "utterly intolerable in a civilized community" . . . ; (3) that the actions of the defendant were the cause of the plaintiff's distress . . . ; and (4) that the emotional distress sustained by the plaintiff was "severe" and of such a nature "that no

---

[7] This court's analysis is focused on the battery because harmful physical contact with Plaintiff did occur. Rousseau is also liable for assault where he led the group to put Plaintiff in reasonable apprehension of physical harm.

reasonable man could be expected to endure it." <u>See</u> <u>Caputo v. Boston Edison Co.</u>, 924 F.2d 11, 13-14 (1st Cir. 1991) (quoting <u>Agis v. Howard Johnson Co.</u>, 371 Mass. 140, 144-45 (1976); Restatement (Second) of the Law of Torts (1965)). Where Plaintiff has alleged facts demonstrating that Rousseau led an attack on Plaintiff in furtherance of a white supremacist agenda, Plaintiff has adequately stated a claim for IIED against Rousseau and is entitled to a default judgment on Count Six.

### IV.    Damages

As detailed below, Plaintiff is entitled under Section 1985(3) to damages to compensate him for his physical and emotional injuries and his lost wages and earning potential. He is also entitled to punitive damages and attorneys' fees. Rousseau and Patriot Front are jointly and severally liable to Plaintiff for these damages. <u>See</u> 42 U.S.C. § 1985(3) ("the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation"); <u>Libertad v. Sanchez</u>, 215 F.3d 206, 208 (1st Cir. 2000) (compensatory damages, punitive damages, and attorneys' fees available for violations of § 1985 (citing <u>Hobson v. Wilson</u>, 737 F.2d 1, 63 (D.C. Cir. 1984); 42 U.S.C. § 1988)); <u>Chao v. Ballista</u>, 2011 U.S. Dist. LEXIS 171763, at *2 (D. Mass. May 5, 2011) (tortfeasors jointly and severally liable for violations § 1983 resulting in a single and indivisible injury); <u>Carey v. Piphus</u>, 435 U.S. 247, 255-56 (1978) (damages awards under § 1983 should be governed by the principle of

compensation). Plaintiff's other causes of action[8] entitle him to much, if not all, of the same

relief—bearing in mind that Plaintiff cannot recover multiple times for the same injury.[9]

    A.   *Legal Standard on Default*

Even if liability is established, the court does not presume that any factual allegations

relating to the amount of damages suffered are true. See Au Bon Pain Corp. v. Artect, Inc., 653

F.2d 61, 65 (2d Cir. 1981). The court must ensure that the damages awarded are reasonable and

demonstrated by the evidence. Fed. R. Civ. P. 55(b)(2)(C). "A hearing may be required . . . to set

damages when the amount is in dispute or is not ascertainable from the pleadings." In re The

Home Rests., Inc., 285 F.3d 111, 114 (1st Cir. 2002).

"A default judgment must not differ in kind from, or exceed in amount, what is

demanded in the pleadings." Fed. R. Civ. P. 54(c). "It follows that a default does not expose a

defendant to impositions not properly identified before the entry of default." Hooper-Haas v.

Ziegler Holdings, LLC, 690 F.3d 34, 40 (1st Cir. 2012).

---

[8] As stated above, Plaintiff seeks compensatory damages for physical harm under Counts One
through Five. Compl. ¶¶ 128, 133, 137, 141, 145. He seeks compensatory damages for lost
wages under Count One as well as Counts Three through Six. Id. ¶¶ 128, 137, 141, 145, 149. He
seeks emotional distress damages under all Counts. Id. ¶¶ 128, 133, 137, 141, 145, 149. Finally,
he seeks punitive damages under Count One. Id. ¶ 129. Plaintiff also seeks reasonable attorneys'
fees and interest. Id. at 44. See supra Part I.

[9] For instance, for Defendants' violations of M.G.L. c. 12 § 11I, Plaintiff is entitled to
"compensatory money damages," the "costs of the litigation," and "reasonable attorneys' fees."
See M.G.L. c. 12 § 11I. For Rousseau's assault and battery against Plaintiff, Plaintiff is entitled
to, at a minimum, damages for his physical injuries, and for IIED, Plaintiff is entitled to recover
for emotional distress. Plaintiff does not provide briefing as to what he is entitled to for
Defendant's civil conspiracy and civil aiding and abetting, but this court need not address those
claims separately because Plaintiff's other causes of action entitle him to the damages that he
seeks for substantially the same conduct.

B.    *Findings of Fact*[10]

1.    Murrell's Physical Injuries[11]

As a result of the attack, Murrell suffered lacerations to his right finger requiring stitches and a splint, lacerations to his head and left eyebrow, and bruises on the left side of his face and both arms. Plaintiff also suffered a sprain to the interphalangeal joint of his right middle finger.

Immediately after the attack, a couple offered Murrell napkins to wipe blood off himself. Murrell was taken by ambulance to Tufts Medical Center, where he received treatment for his physical injuries.

Since the attack, Murrell's hand locks up a few hours into playing his instrument, a problem that continued through the time of the hearing.

2.    Murrell's Psychological Injuries[12]

By Murrell's own account, his physical injuries were less severe and less enduring than his psychological injuries. During the attack, Murrell did not know who his attackers were, and

---

[10] Facts in this Section are drawn from the testimony and exhibits submitted at the October 2 and 3, 2024 evidentiary hearing and a supplemental submission filed with leave of court after the hearing. Further detail as to materials considered is provided in each subsection.

[11] Facts in this subsection are drawn from: (1) the medical report from Murrell's visit to the hospital, see July 2, 2022 Medical Report [Doc. No. 48-7]; (2) a photograph of Murrell speaking at a press conference after the attack, showing bandages on Murrell's hand, see July 4, 2022 Image of Murrell [Doc. No. 48-4]; (3) an incident report by Officer Jason Turcotte of the Boston Police Department regarding the attack, see July 2, 2022 Police Report [Doc. No. 48-5]; (4) a police report prepared by a Detective with the Boston Police Department Civil Rights Unit, see Detective Lakenya Webster July 9, 2022 Report [Doc. No. 48-6]; (5) the testimony of Charles Murrell; and (6) the testimony of Katrina Jabro.

[12] Facts in this subsection are drawn from: (1) the testimony of Charles Murrell; (2) the testimony of Oliver Burns, a friend and colleague of Murrell who lived with Murrell for a period; (3) the testimony of Katrina Jabro; and (4) the testimony of Dr. Tina Adams, a full-time psychologist in private practice with extensive experience performing diagnostic assessments, whom this court deemed qualified as an expert in the diagnoses of psychological disorders and the impact of trauma, pursuant to Federal Rule of Evidence 702.

he was scared they would kill him. As they attacked him, Murrell's vision started to go black. Katrina Jabro, a witness to the attack, testified that, immediately after the attack, Murrell appeared to be in shock while talking to police officers. After the attack, Murrell started having violent dreams. He still struggles to sleep through the night and sometimes wakes up drenched in sweat. Murrell was uncomfortable with the unwanted publicity he received because of the attack, particularly with the photos of himself in the newspaper pressed up against a pole.

Before the attack, Murrell had an active social life. He had a "brotherhood" with Burns and another individual, who was referred to at the hearing only by his first name, Greg. Murrell attended the home-birth of Greg's second child and traveled for leisure with both Greg and Burns. Murrell was comfortable entering unfamiliar spaces and having conversations with people he did not know. Before the attack, Murrell was also close with his family, and he saw his Boston-based family members almost every day.

When Burns first met Murrell in 2021, Murrell was ambitious, inquisitive, outgoing, gentle, and open-minded. Murrell frequently was a caretaker for Greg's baby and was involved in various creative projects to disrupt the classical music scene. Now, Murrell tries to force himself to socialize but seeks spaces that are not filled with people. He barely speaks with or sees Greg or Burns, and he was unable to articulate why at this court's evidentiary hearing. He now only sees his family around once per year.

Murrell's personality changed after the attack. In one incident, Murrell yelled at a child at work, something Burns had never seen Murrell do before. Murrell's hygiene also suffered following the attack. According to Burns, Murrell went into survival mode and lost the ability to take initiative over his life.

Dr. Adams reviewed Murrell's medical records, spoke with some of his friends and family, examined him, and administered several diagnostic tests. She found that Patriot Front's attack of Murrell caused him psychological damage and distress—damage and distress that have devastated his ability to earn a living, dampened his passion for music, caused him to isolate himself from family and friends, and generally hindered his ability to function and make decisions day-to-day. Dr. Adams explained that the attack was a significant traumatic event for Murrell that led him to experience intrusive thoughts, demonstrate disproportionate reactions to minor stimuli, engage in hypervigilance with respect to his environment, and consistently feel unsafe. She explained further that, after the attack, Murrell experienced low energy, a lack of motivation to engage in once-routine tasks, trouble thinking, social withdrawal, feelings of hopelessness and worthlessness, and bouts of crying. Murrell also displayed diminished insight into his negative emotions and reasons for acting in certain ways, such as withdrawing from family life. Dr. Adams concluded that the attack caused Murrell's severe Post-Traumatic Stress Disorder ("PTSD"), major depressive disorder, and generalized anxiety disorder. These conditions overwhelm Murrell's coping skills and impact his ability to function.

Dr. Adams stated that Murrell's prognosis is poor without intervention and clinical support. She further stated that he lacks the financial resources to access mental health services and is focusing on day-to-day survival. Murrell has not engaged in formal counseling since the attack.

3.        Murrell's Lost Wages and Lost Employment Opportunities[13]

Murrell's injuries have forced him to change how he makes a living. Before the attack, Murrell played on the street five to seven days per week for, on average, six to twelve hours per day. He primarily played in the warm months of the year—May through September. These performances earned Murrell between $800 and $1,200 per week. Murrell also used to play with groups such as beheard.world and Trend Stream. For eight to ten weeks in 2021 and early 2022, Murrell played such performances three to four times per week, for between $150 and $250 per performance.

Before the attack, Murrell earned a substantial part of his income through teaching. Between 2014 and 2016, for his work at the Home for Little Wanderers, Murrell earned approximately $42,000 per year. As a teacher in Spoke's summer program in 2021, Murrell earned $1,000 per week for ten weeks, after which Spoke awarded Murrell with a fellowship that paid between $500 and $600 per week, for approximately three to four months. Murrell estimates that he earned between $20,000 and $24,000 working for Spoke between 2021 and 2022. The artist's residency Murrell received through the organization was estimated by the founder of Spoke to be worth between $5,000 and $6,000.

The attack made it difficult for Murrell to play the saxophone with the same intensity. Murrell now performs on the street only one to two days per week, and only in hour or hour-and-a-half stints. He tried playing near the Boston Public Library again but experienced a panic attack for the first time and stopped performing in that area. Murrell now primarily plays in less

---

[13] Facts in this subsection are drawn from the testimony of Charles Murrell and Oliver Burns.

22

trafficked locations where he feels safer. Due to these changes, he now makes between $50 and $75 per street performance.

Murrell still engages in other performances, but only once or twice every other week, for between $25 and $100 per performance. He makes less in these performances than he did in his performances before the attack because his anxiety has led him to seek out performance environments that cause him less psychological harm. Murrell still works with children, but primarily in one-on-one settings, rather than with 20 or more students at a time as he did before. He works one-on-one because he now struggles to regulate his negative emotions when working with larger groups. Murrell no longer works with beheard.world. He still works with Spoke, but he now focuses on the organization's 24-hour vigil honoring HIV/AIDS awareness month because he can do that work alone. He no longer works on other performances and engagements with the organization. Though he still has a company laptop through Spoke, the organization no longer pays him regular wages. Murrell never traveled on the Spoke-sponsored trip to Italy that was scheduled for August 2022, and for which he had received a scholarship valued between $5,000 to $6,000. Just before he was set to leave, Murrell told the organizers he could not go because he was incapable of managing the travel logistics.

C.    *Conclusions of Law*

1.    Compensatory Damages

Plaintiff is entitled to damages for the physical injuries he suffered to his hand, face, and arm. For these physical injuries, the court awards $25,000.

Plaintiff is also entitled to damages for the psychological injuries and emotional distress that he suffered. Because of the attack, Murrell now suffers from severe PTSD, major depressive disorder, and generalized anxiety disorder. These psychological disorders have interfered with

Plaintiff's relationships and well-being, not to mention his employment, as discussed below. His prognosis is poor without psychological intervention, but he lacks the resources for formal counseling. As a result, since the attack, Murrell has essentially been in survival mode.

For these psychological and emotional distress injuries, this court awards Plaintiff $500,000. This award is well in line with compensatory damages awarded in other cases. See, e.g., Charles v. Leo, 96 Mass. App. Ct. 326, 343 (2019) (affirming $500,000 award for emotional distress in an employment-related racial discrimination and retaliation case but remanding for reconsideration of jury's $10,000,000 punitive damages award); Borne v. Haverhill Golf & Country Club, Inc., 58 Mass. App. Ct. 306, 320 (2003) (affirming compensatory damages awards between $16,000 and $80,000 to plaintiffs who sued a golf club for sex-based discrimination, with no finding of physical injury); Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 144 (1st Cir. 2009) (affirming $500,000 damages award for emotional distress based on employer's failure to accommodate plaintiff's disability).

        2.     Special Damages

Special damages for lost earnings and lost future earnings are also appropriate here. Plaintiff has had to adjust how he makes a living, in part due to his physical injuries to his hand but largely because of the psychological trauma he has endured. See supra Section IV.B. Before the attack, Plaintiff made between $800 and $1,200 per week, for five months of the year, for his outdoor performances. After the attack, he makes only $50 to $75 per street performance because they are shorter and in less trafficked areas, and he only does such performances one to two days per week—amounting to between $100 and $150 per week. Thus, Plaintiff has lost between $650 and $1100 per week for his street performances, for about 20 weeks of the year, amounting to between $13,000 and $22,000 per year.

As for his other performances, Murrell used to be able to earn between $450 and $1,000 per week for such performances (three to four times per week at $150 to $250 per performance), which he performed for eight to ten weeks in 2021 and early 2022. Now, he earns between $12.50 and $100 per week for such performances because he has had to seek out performance venues that do not inflict psychological harm. That amounts to a loss of between $350 and $987.50 per week for the changes to his non-street performances.[14] Assuming ten weeks of such performances, that is a loss of $3,500 to $9,875 per year.

Murrell earned between $20,000 and $24,000 working at Spoke between the summer of 2021 and July 2022. He worked as a teaching artist in 2021 for Spoke's summer program for around $1,000 per week for ten weeks, after which time he received a fellowship with further funding. Murrell also received an offer for a residency in Italy worth between $5,000 and $6,000. Now, he struggles to work with more than a few students at a time, which has limited his teaching work. Murrell was unable to go to Italy for the residency for psychological reasons, and his work with Spoke has dwindled such that the company no longer pays him regular wages.

This court finds that Plaintiff has lost wages and employment opportunities worth roughly $45,000 per year—losses that Plaintiff will likely continue to suffer until his psychological condition improves. These are calculated in the table below:[15]

---

[14] Based on the estimates Murrell gave, the maximum loss he suffered per week was $987.50 ($1,000 - $12.50), while the minimum loss he suffered per week was $350 ($450 - $100).

[15] Because Plaintiff had not taught full time since 2016, this court does not include in its calculation the amount Plaintiff was earning through full-time teaching.

**Plaintiff's Lost Earnings**

| Type of Work | Earnings Before Attack | Earnings After Attack | Lost Earnings | Lost Earnings Per Year |
|---|---|---|---|---|
| Street Performances | $800-$1,200 Per Week | $100-$150 Per Week | $650-$1,100 Per Week (20 weeks/year) | $13,000-$22,000 |
| Other Performances | $450-$1,000 Per Week | $12.50-$100 Per Week | $350-$987.50 Per Week (10 weeks/year) | $3,500-$9,875 |
| Work with Spoke | $20,000-$24,000 Per Year | $0 | $20,000-$24,000 Per Year | $20,000-$24,000 |
| | | | | **Total: $36,500-$55,875** |

This court shall award Plaintiff damages for two and a half years of lost wages and two and a half years of lost future employment opportunities, based on an estimated average annual amount of $45,000, for an award of $225,000. The court adds to this the estimated $5,000 value of the foregone residency, for a total lost earnings award of $230,000.

3.    Punitive Damages

Punitive damages are available for Section 1985(3) violations "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983) (discussing punitive damages as to a 1983 claim). See also Libertad v. Sanchez, 215 F.3d 206, 208 (1st Cir. 2000) ("[I]nsofar as the allegations establish that [the defendant] acted intentionally and out of hostility towards women, they also seem sufficient to put the question of punitive damages into play.").

This court finds that this standard for punitive damages is met here. As discussed above, see supra Section III.B.3, Patriot Front's physical attack of Murrell occurred with Rousseau's

encouragement, on a public sidewalk that Patriot Front and Rousseau sought to control without regard for Murrell's right to be there. Murrell's attackers showed no remorse for their actions. Instead, Patriot Front and Rousseau glorified the attack by posting a video online with a clip of the group pinning Murrell against the light post and pushing him into the busy road, to promote the view that non-white individuals like Murrell should be subordinated to white people. Punitive damages are necessary to deter similar acts in the future.

For these reasons, this court awards punitive damages in the amount of $2,000,000.

4.    Attorneys' Fees

"In any action or proceeding to enforce a provision of section[] . . . 1985 . . . the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs," including expert fees. See 42 U.S.C. §§ 1988(b), (c). This court finds an award of attorneys' fees appropriate here, including fees for expert witnesses, and grants permission for Plaintiff to file a motion for attorneys' fees no later than January 31, 2025.

## V.    Conclusion

For the foregoing reasons, Plaintiff's Motion for Default Judgment [Doc. No. 46] is GRANTED. The court awards $25,000 for physical injuries, $500,000 for psychological injuries and emotional distress damages, $230,000 in special damages for lost wages and earning opportunities, and $2,000,000 in punitive damages, for a total judgment of $2,755,000, plus reasonable attorneys' fees in an amount to be determined, and post-judgment interest pursuant to 28 U.S.C. § 1961.

IT IS SO ORDERED.

January 13, 2025                    /s/ Indira Talwani
                                   United States District Judge